Ronald G. DAVIS, Plaintiff-Appellee,

v.

FOX RIVER TRACTOR COMPANY, a
Division of Koehring Company,
Defendant-Appellant.

No. 74–1392.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 25, 1975.

Decided June 10, 1975.

Thomas W. Woody, Oklahoma City,
Okl. (Merchant & Barfield, Amarillo,
Tex., on the brief), for plaintiff-appellee.

Burton J. Johnson, Oklahoma City,
Okl. (of counsel, Watts, Looney, Nichols,

**482**

Johnson & Hayes, Oklahoma City, Okl., on the brief), for defendant-appellant.

Before LEWIS, Chief Judge, and BREITENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

Plaintiff-appellee was awarded a verdict and judgment in the amount of $125,000 for personal injuries which were suffered by him when he slipped off the tailgate of a dump truck while trying to alight from it and fell into an open hopper into which the grain from the tilted truck was then being deposited for the purpose of being fed to a fan and blower which in turn propelled it sufficiently high so as to place it in the top of silos or storage areas. The essential parts of the offending machine are a hopper which receives the grain and which houses augers, three of which move the forage or grain to the back of the hopper and are propelled by a fourth one which is perpendicular to the other three and moves the material to the fan and pipe. Plaintiff-appellee slipped from the dump truck into the hopper and suffered injuries when his feet and legs became caught in the augers and the fan.[1]

Fox River Tractor Company, appellant herein, was shown to have manufactured this particular forage blower. The unit was manufactured in 1971 and was then sold to one Harold Smith, who was the brother of the plaintiff-appellee's employer. The unit is not equipped with a motor. Its source of power is from a separate engine. There is a clutch handle over the top of the hopper capable of stopping the movement of the augers.

The center of the controversy in this case is the fact that the hopper did not have a screen on it to protect a person working as the plaintiff was working from coming into contact with the augers and incurring injury such as that which he suffered. The screen which covers the hopper has an outside frame three and one-half feet long and three feet wide. Metal dowels run lengthwise and widthwise, and the space within these dowels is approximately a square foot. Appellant defends the extensive spacing contending that this amount of space was needed in order for the large chunks of grain or forage to go through. The fact question at the trial was whether the machine could work efficiently with a screen having dimensions capable of preventing the feet and legs of workmen from coming into contact with the augers.

After having worked a very long day on October 17, 1972, and following his having had a short rest at home, plaintiff-appellee returned at 11:00 p. m. on the 17th and at approximately 5:30–6:00 a. m. on the morning of the 18th (while continuing to work) the injury occurred (as previously noted), while he tried to climb out of the truck bed. He slipped and fell into the moving augers. The working conditions were dangerous. The grain was wet, the bed of the dump truck was at a downward angle so as to bring about the movement of the grain and he was engaged in helping the grain or forage move and breaking up clumps of it so that the material placed in the hopper could be refined, whereby the augers and blower could deal with it. Plaintiff-appellee acknowledged that his shoes were wet and slippery and also acknowledged that possibly he had used the side of the machine to step on when exiting from the truck. Almost immediately after he fell into the hopper his companions turned off the power.

The trial court proceeded on the doctrine of products liability or, as the Oklahoma Supreme Court terms it, Manufacturers' Products Liability based on the ALI Restatement of Torts 2d § 402A.

The expert testimony on behalf of plaintiff-appellee, given by a mechanical engineer, a professor at the University of Houston, was that the machine had been defectively designed in that it did

---

**1.** It is somewhat difficult to describe the workings of this mechanism in a manner which allows the reader to appreciate its nature and character. For this reason, Appendices A and B, photographs of the mechanism, are attached to this opinion.

not have a protective shield capable of protecting a man's feet from coming into contact with the augers inside the hopper. Other evidence on behalf of plaintiff-appellee was to the effect that after the injury plaintiff-appellee's employer borrowed a machine which was similar to that which injured the plaintiff-appellee. A grid was welded across the top which was so spaced as to prevent a man's foot from entering into the dangerous area. The purpose of this was to refute the defendant-appellant's contention that the machine could not perform the work which it was designed to perform if grids of this dimension covered it. It would have been impossible for the grain to penetrate these grids, according to defendant's witnesses. But plaintiff-appellee's evidence sought to demonstrate the contrary. Indeed, the employer was shown to have loaded more than a million pounds of grain into the silo with the use of the borrowed machine.

Defendant-appellant now seeks a reversal of the sizeable verdict on the following grounds:

1. Contending that the trial court erred in failing and refusing to rule that the evidence did not substantiate the tests provided in Restatement 2d § 402A.

2. That it was error for the court to rule that the expert on behalf of plaintiff-appellee was qualified.

3. That it was error for the court to receive testimony concerning collateral source payment.

We reject the above contentions and affirm the judgment.

## I.

The trial court did not err in refusing to direct a verdict for the defendant. The argument of defendant is that the evidence failed to establish a case under the law of manufacturers' products liability as it is applied in the State of Oklahoma. We must, however, on motion for directed verdict consider the evidence and the inferences to be drawn from the evidence in a light most favorable to the party against whom the motion is directed. If the evidence and the inferences are such that reasonably minded persons in the exercise of fair and impartial judgment are able to reach different conclusions on the issues of fact, the motion is to be denied and the question is properly to be submitted to the jury. Transcontinental Bus System, Inc. v. Taylor, 265 F.2d 913 (10th Cir. 1959). The Oklahoma courts follow this identical principle. *See* Seay v. General Elevator Co., 522 P.2d 1022 (Okl.1974).

Turning to the elements of § 402A, *supra*, the question raised is whether the device which caused the injury is unreasonably dangerous within the meaning of § 402A, which provides that the seller of a product in a defective condition, unreasonably dangerous, to the user or consumer or to his property is subject to liability for harm caused to the ultimate user or consumer.[2]

The contention of plaintiff is that the source of the dangerousness was the machine's defective design, and the question of law which we consider is whether the evidence satisfied this. Plaintiff-appellee's expert testified that the defect was in the grid spacing and the protective shield. It is the width and breadth of this spacing, the extent of which renders it incapable of preventing a foot from penetrating it and going into the augers, which is the alleged defective design. The expert said that this defect could have been remedied without substantial expenditure and without diminishing efficiency.

> The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

**2.** The ruling decision in Oklahoma, Kirkland v. General Motors Corp., 521 P.2d 1353, 1362 (Okl.1974) is the authority which governs our decision.

The Oklahoma Supreme Court has emphasized the definition of "unreasonably dangerous" contained in Comment I under § 402A:

The defendant's expert, on the other hand, testified that if smaller grid spacings were used, the forage or grain would not go through to the hopper. Plaintiff's showing that his employer had processed more than a million pounds of grain through a much smaller grid which had been welded to a borrowed machine contradicted this. This latter allowed the jury to determine that a more effective grid could have been installed without sacrificing efficiency.

Defendant's expert also testified that no other machine had such a grid. Plaintiff's expert countered that while no forage blowers had such protective devices, he was aware of standards of general applicability to the design of agricultural implements other than the forage blower and that these were in existence at the time that the subject machine was designed. Plaintiff introduced a specific safety standard which had been promulgated by the American Society of Agricultural Engineers for the safety of agricultural equipment. This called for shielding to a degree consistent with the function of the component. Defendant's engineer did not quarrel with that standard.[3] Defendant-appellant's engineer finally testified that the defendant company acknowledged that the agricultural equipment standard required it to design a shield for the hopper if it were possible, whereby it could still function.

In the light of the above evidence, it cannot be said that the evidence is insufficient to support the applicable standards; it established the necessity for having a protective shield and it pointed up the necessity for the use of a shield which was shown to be capable of design consistent with proper functioning. The evidence that such a protective shield could be fashioned was cogent.

■ In determining whether a machine is defective in design, the jury is entitled to weigh the ease of construction of a safety device against the magnitude of threatened harm in not constructing it. If the latter is of great magnitude and the former is relatively inconsequential, the trier may determine that the machine was defectively designed. The jury so found.

## II.

We are not, of course, suggesting that a manufacturer is an insurer. We merely say that the plaintiff has sustained his proof. Defendant-appellant further maintains that the machine was not unreasonably dangerous within the meaning given to the term by the decision of Kirkland v. General Motors Corp., *supra*. The question is, would the ordinary user having ordinary knowledge contemplate that the device was unreasonably dangerous? All that we can say on this is that the characteristics of this machine were described in minute detail to the jury. Further photographs such as those appended to this opinion were submitted. As a result, the jury had before it knowledge that the machine was dangerous.

■ Is the fact that these defects were obvious a factor which diminishes its legal dangerousness as the defendant-appellant contends?[4] If a device is dan-

---

**3.** He also acknowledged familiarity with the American National Standards Safety Code for Conveyers which provided that: "[a]ll openings to hoppers and chutes shall be protected to prevent persons from stepping into them. If a hopper or chute is equipped with a grating to protect conveyers, such a grating will be considered as sufficient protection, provided that one dimension of the opening does not exceed 2 inches."

**4.** The defendant cites several cases in support of this proposition. *See* Iacurci v. Lummus

Co., 340 F.2d 868 (2d Cir. 1965); Ford Motor Co. v. Wobbler, 32 F.2d 18 (7th Cir.), cert. denied, 280 U.S. 565, 50 S.Ct. 25, 74 L.Ed. 619 (1929); Tomicich v. Western-Knapp Engineering Co., 292 F.Supp. 323 (D.Mont.1968); Blunk v. Allis-Chalmers Manufacturing Co., 143 Ind. App. 631, 242 N.E.2d 122 (1968); Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802 (1950).

All of these cases were decided under a common law negligence standard rather than the Restatement 2d § 402A strict liability standard. Since Restatement 2d § 402A imposes a

gerous to life and limb to the degree that no amount of care on the part of the user can overcome the defect so as to prevent injury, the obviousness does not alleviate the danger. We have difficulty seeing how the knowledge of the dangerousness can alleviate the dangerous condition inasmuch as the performance by plaintiff of his assigned tasks subjected him to injury regardless of the care exercised.[5]

We are of the opinion that the manufacturer cannot escape liability by contending that the defect was obvious where, as here, knowledge of the highly hazardous condition cannot serve to prevent the injury since the plaintiff-appellee must work.

### III.

There is an authority in Oklahoma which is closely parallel to the present one. It is the decision of the Oklahoma Supreme Court in Royse v. Stine, 473 P.2d 923 (Okl.1970). There, as here, the plaintiff was injured while forcing cotton seed hulls into an auger blade which conveyed the hulls into a special wagon. His foot slipped into the auger blade. This case predated the adoption by Oklahoma of § 402A and it was therefore tried on a negligence theory. But even judged under this more difficult theory the Oklahoma court upheld liability, concluding that it was open to the jury to find that the defendant was negligent and that plaintiff was not contributorily negligent. Although this decision is not a products liability case like the case at bar, it successfully serves to dispose of

the contributory fault issue which defendant-appellant has sought in one way or another to interpose.

### IV.

We have considered the defendant's contention that it was error to allow plaintiff's expert to testify. The argument boils down to the fact that the expert was a mechanical engineer rather than an agricultural one. This is a very thin line to draw. Who can say that an agricultural engineer, whatever that is, would be better qualified? Such a matter is in the broad discretion of the trial court.[6] The expert was a professor of mechanical engineering at the University of Houston. He testified that he was particularly interested in conveying substances like grain from one place to another. He was also shown to have examined the design of the blower in question in some detail.

It cannot be said that the witnesses were lacking in the necessary qualifications. The weight of the evidence is for the jury to determine.

### V.

Finally, it is argued that it was error to allow plaintiff to admit evidence as to the blower plaintiff's employer used to complete the job the plaintiff had been doing. Particular objection is made to the evidence that the employer welded the grid on before commencing. This in our view does not violate the rule against showing repairs or showing an example of successful performance. This was not repair evidence. Instead, it

higher standard of conduct upon manufacturers than does common law negligence, it is not clear that any of these courts would have reached the same result under Restatement 2d § 402A.

5. See Blim v. Newburry Industries, Inc., 443 F.2d 1126 (10th Cir. 1971); Wheeler v. Standard Tool and Manufacturing Co., 359 F.Supp. 298 (S.D.N.Y.1973); Dorsey v. Yoder Co., 331 F.Supp. 753 (E.D.Pa.1971), aff'd, 474 F.2d 1339 (1973); Byrnes v. Economic Machinery Co., 41 Mich.App. 192, 200 N.W.2d 104 (1972); Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281 (1972). See also Palmer v. Massey-

Fergusen, Inc., 3 Wash.App. 508, 476 P.2d 713, 719 (1970), wherein it was said:

[t]he manufacturer of the obviously defective product ought not to escape because the product was obviously a bad one.

6. See Bosse v. Ideco Division of Dresser Industries, Inc., 412 F.2d 567 (10th Cir. 1969); Grain Dealers Mutual Ins. Co. v. Farmers Union Co-op Elevator & Shipping Ass'n, 377 F.2d 672 (10th Cir. 1967); Riley v. Layton, 329 F.2d 53 (10th Cir. 1964); Johns v. Safeway Stores, Inc., 463 P.2d 701 (Okl.App.1969); Barger v. Mizel, 424 P.2d 41 (Okl.1967).

was responsive to testimony on behalf of the defendant that a grid would render the machine ineffective. The court did not err.

We have considered the other points raised, namely, that it was error to allow testimony as to collateral source payments, and the plaintiff's counsel was guilty of misconduct. Neither point has merit.

The judgment of the district court is affirmed.

Appendix A

Appendix B